Good morning. Welcome to the Ninth Circuit sitting in Phoenix. I'm Bridget Beatty and my chambers are here in Phoenix. I'm very pleased today to be joined by my colleague Susan Graber from Portland, Oregon, and Judge Graber and I are very happy to have Judge Navarro sitting with us from the District of Nevada. This morning we have two cases for argument. The others have been submitted. The first case for argument is case number 24-797, McClain v. Thornhill, and we have three different attorneys arguing this morning. I understand that counsel for Thornhill and for the government are splitting their time and we're going to have separate clocks for you for that time. All right. So, Mr. McDonald, whenever you're ready, please proceed. Good morning, your honors. May it please the court. Randy McDonald on behalf of the petitioner Chris McClain. I'd like to reserve five minutes for rebuttal and I'll watch my time. The district court erred by declining to grant a writ of habeas corpus on the basis that Mr. McClain's statements, which were recorded and played at length during trial and heavily relied upon by the prosecutor, were obtained in violation of Miranda v. Arizona and Mincy v. Arizona. The district court erred either under the independent review we urge as appropriate standard in light of Loper Bright v. Raimondo or applying the traditional ed pediferance as outlined in Williams v. Taylor. And so we ask this court to reverse and remand to the district court with instructions to grant the writ. I want to first address the merits of Mr. McClain's claim and then turn to the question of whether Loper Bright implicitly overrules this court's decision in Crater v. Galatza and that so-called ed pediferance is constitutional, unless there are more immediate questions on that. In Mincy v. Arizona, the Supreme Court held that where a defendant was, quote, weakened by pain and shock, isolated from family, friends and legal counsel and barely conscious, his will was simply overborne. That is exactly the situation that was faced by Mr. McClain. The witnesses at the scene described Mr. McClain as confused and disoriented. He was gray and ashen, pale. He was groaning in pain, holding his abdomen because he had a ruptured spleen and was bleeding internally. He was strapped to a backboard and transported to the hospital where he was kept for an hour and a half before being given any kind of pain medication, often screaming out in pain and giving incoherent. So is it important that in Mincy the petitioner wasn't lucid, that he was incoherent in making nonsensical statements? And here it appears that Mr. McClain at the scene was lucid and was able to communicate. Is that a significant difference that we should consider? So I don't think that lucidity is the deciding factor in Mincy. And first, I think that there is significant evidence in the record in Mincy that Mr. Mincy was coherent. He was writing notes. He seemed to be answering the questions via the notes. And in this case, Mr. McClain, although he was responding to questions, he very frequently seemed to be confused. He was giving contradictory answers. In fact, that's partly what the state court relied upon. The prosecutor in the state court relied upon these statements saying sort of, look, he's giving contradictory statements. You can see inside of his mind. So I'm not sure that it's correct to say that in either or both the cases, the defendant was completely lucid. And I don't think that that is required under Mincy. I think Mincy is more a question of whether – I think the language is the confession was the product of a rational intellect and a free will. So the question is not whether he's lucid or coherent, but rather whether in the totality of the circumstances, his will was overborne and the confession was thus involuntary. I have a question about that. If we were to assume for the sake of argument that there was Mincy error, was it nonetheless harmless in view of the other evidence in the case? So I would argue no. The state cites to a Sixth Circuit case saying that overwhelming evidence is sufficient under the harmless error standard. This court has not adopted that test. The quote from Gent v. Woodford in our brief says, regardless of whether there's sufficient evidence to support the conviction apart from the error, this court must determine whether or not the error had a substantial and injurious effect. And I think here the real relevant factor was Mr. McLean's state of mind. In the manslaughter charge, the aggravated assault and the criminal damage conviction, the relevant state of mind is recklessness. And when the state cites to its overwhelming evidence, it effectively points to the speed, the presence of marijuana, the drug test. There's also, if I'm remembering this correctly, the court admitted evidence of one of his prior convictions for the purpose of showing that he understood the risks. Am I right about that? Yes, there was. And that was a subject of one of our uncertified issues, that there was evidence. It is. So yeah, I agree. So the question, would you put that into the mix? So I agree that there was this other evidence of prior DUIs that was used to show that he understood the risk. But I guess I'm not sure that that evidence really bolsters the general understanding that most people have about DUIs. And in other words, I don't I don't think that it really adds much to the mix, because I think you can assume that many people understand the risk inherent in drinking and driving. And I think the relevant factor here is that that reckless state of mind is is what is at issue. And furthermore, I think it is certainly relevant. And this court has said so, that the fact that the prosecutor in the state court relied so heavily on this evidence ought to be considered when you're deciding whether there was harmless error. They spent the better part of a day of trial listening to this recording. The prosecutor in his closing argument repeatedly emphasized this recording. He said the tape doesn't lie. He also said you get a window into what Mr. McLean was thinking through the tape. And so I think even if you look at some of the other evidence, the fact that this tape was so important to the prosecution, it was the subject of a three day voluntariness hearing. And then the better part of a day of the presentation of evidence, it was clearly very important to the prosecution. It was heavily emphasized in the prosecution's argument. And even Mincy itself says any criminal trial use against a defendant of his involuntary statement is a denial of due process of law, even though there is ample evidence aside from the confession to support his conviction. So the case law on involuntary confessions is much more expansive and the remedy is much greater than in Miranda. And that sort of is what Mincy is about, about whether you can also suppress involuntary statements used to impeach a defendant's testimony rather than just in your case in chief. And so I would argue that the state court's decision on the Mincy issue is contrary to clearly established federal law on at least two counts. First, because it is faced with a series of facts that is materially indistinguishable from Mincy. And also separately because the state court appears to apply the wrong standard. So this is language from the state court decision. The detective never made any promise, used any force, or threatened McLean in any way. And I think that could equally be said of Mincy. And the state court decision, the Arizona state court case that is cited in that portion of the Arizona Court of Appeals decision doesn't even cite to Mincy. And so I think the state court applied a different standard that seems to require that the coercive, that the conditions creating the coercive situation are created by the police when that is not what Mincy says. I think Mincy says so long as you exploit those coercive situations to the benefit of the state to get a coerced confession, that is an involuntary confession. I would also argue that the court decision that Mr. McLean was not in custody was an unreasonable application of Miranda. From the moment the crash occurred until he was formally placed under arrest at the hospital, he was never outside of the presence of a police officer. For much of that time, the police were recording the conversations. In fact, Detective Bills, who accompanied Mr. McLean to the hospital, was specifically directed to do so and did not have a tape recorder and so went to get a tape recorder from another officer at the scene. So it was very clear that his intent was to record statements from Mr. McLean for use later on. The state cites to a 1985 case, U.S. v. Martin, and that case, there's a paragraph from that case in which says that if the police took a criminal suspect to the hospital from the scene of a crime, monitored the patient's stay, stationed themselves outside the door, arranged an extended treatment schedule with the doctors or some combination of these law enforcement restraint amounting to custody could result. And I think that is exactly the situation that we have here. And if there are no other questions about the Mincy and Miranda issues, I'd like to turn to the Loper Bright issue. So I think in light of the Supreme Court's decision in Loper Bright v. Raimondo, this court should exercise its independent judgment in evaluating the constitutional claim and should not defer to the state court decision. And what we're asking this court, the standard that we're asking this court to apply is the standard that is outlined in Justice Stevens' concurring opinion in Williams v. Taylor, in which he says, in sum, the statute 2254 D1 directs federal courts to attend to every state court judgment with utmost care, but it does not require them to defer to that opinion of every reasonable state court judge on the content of federal law. If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody violates the Constitution, that independent judgment should prevail. And so I have a hard time understanding, honestly, why Loper Bright would even be relevant, because it dealt with a court-made rule. And here Congress has told courts how to review habeas petitions. And they have, as I understand it, authority to set those parameters for our review of habeas petitions. So why is the alteration of a court-made rule having to do with agencies? Why is that transferable? So I think at base you have to look at Loper Bright's reasoning, the reasoning underpinning the Loper Bright decision. And the very first section of the body of that opinion starts with Article III requires federal courts to say what the law is. And they interpreted the APA in light of that requirement to say what the law is. And I think the fact that AEDPA is a statute passed by the legislature perhaps even more emphatically emphasizes the separation of powers issue in play here. So in essence you're really saying that AEDPA is unconstitutional? I think that AEDPA, as it was interpreted by Justice O'Connor's majority opinion in Williams v. Taylor, is unconstitutional. I am not arguing that the statute itself is unconstitutional, but just as it has been applied. And if you look at the procession of how AEDPA has been interpreted after Williams v. Taylor, if you look at Harrington v. Richter, and we have the standard of no fair-minded jurist could reach the conclusion of the state court, you're effectively saying that a state court decision is reasonable unless every single judge anywhere in the country would disagree with it. It's just it's too high a standard and it takes away from this court the ability to independently judge the constitutionality of the cases in front of it. It effectively requires this court to defer to the wrong but reasonable decisions of state court judges, which is exactly what Loper Bright says this court should not do in administrative proceedings. And so I think if you were to replace AEDPA deference with Chevron deference in Loper Bright, I think you get the sort of same type of analysis that we're asking you to do here. And in fact, you know, going back to Justice Stevens' concurring opinion in Williams v. Taylor, there's very similar language in Loper Bright as to what survives of Chevron deference after Loper Bright. It says courts must, this is from Loper Bright, courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority. As the APA requires careful attention to the judgment of the executive branch may help inform that inquiry. So even after Chevron has fallen, Loper Bright says that courts should give careful attention to the judgments of the executive. And I think similarly, Justice Stevens' interpretation of AEDPA requires that this court carefully weigh the reasons for accepting a state court decision, but should not itself defer to those decisions. So in that vein, this court is not being asked to overrule a Supreme Court decision because Williams is not a constitutional decision. This court recognized that in Crater v. Galatza. But this court will be required under our request to overwrite a prior circuit court decision, which is Crater v. Galatza. And it can do that so long as an intervening Supreme Court decision is clearly irreconcilable with Crater. And I would argue that Loper Bright and the reasoning underlining that decision is clearly irreconcilable with this court's decision in Crater v. Galatza, that AEDPA deference is constitutional. Would we also be creating a circuit split with the Sixth and the Eleventh Circuits if we adopted your argument? I know that the Sixth Circuit case was cited by the state and the government's brief, and that was an unpublished decision. I don't know that an Eleventh Circuit case was cited, and I'm sorry, I'm not aware of that case. But if it does in fact exist, which I assume that it does, then yes, I guess this court reaching a different conclusion would create a circuit split. I suppose this issue is, in that instance, I suppose this issue would ultimately have to be decided by the Supreme Court. But this court in its independent judgment can overrule prior circuit precedent if it believes that the Supreme Court decision is clearly irreconcilable. So the Eleventh Circuit case is Bates v. Secretary of Florida Department of Corrections. It's from August of this year, so it's pretty recent, and it is unpublished. But I believe the Sixth Circuit case, Miles v. Floyd, which is from March of this year, is published. I thought... I only have a Westlaw site, so I can't be certain, but I don't see anything... Yeah, I agree with Your Honor. I saw the Westlaw site in either the state's brief or the government brief, and I suppose I assumed that it was unpublished, but I could be wrong about that. But in any event, I assume your argument is that even if we were creating a circuit split, those circuits are just wrong. I think that would be my argument, yes. Are there any... I'm conscious of my time, and I want to reserve some time for rebuttal, but I also want to get to any of this court's questions if they have any. You're doing well. You have a little over seven minutes, and you wanted to reserve five, so if you want to reserve the balance, that's fine. I can reserve the balance of my time if that's all right. Good morning, Your Honors. May it please the Court, Eric Knoblauch for Respondents, State of Arizona, and Ryan Thurnell. Because the Department of Justice has intervened specifically to address Looper-Bright, respondents will rest on the arguments in its briefing on that issue and address specifically the merits on why McLean has not met his burden under AEDPA and BRECT. Looking at AEDPA, the District Court correctly found that McLean failed to establish the statutory standard. I'll first address the custody determination, and then I'll discuss the voluntariness. McLean seemingly concedes that the State Court identified the correct governing legal principle. His argument seems to be that the application was unreasonable because it ignored several facts. McLean discusses that the police took him to the hospital, directed his care. But he was taken in an ambulance, and the remainder is just speculation, which is not enough to show that he's met his burden. He also contends that the restraints were part of a formal arrest. But if we look, the record is replete with evidence that it was the doctors that were the ones that were keeping him on the back board with a C-spine. He asked the ambulance personnel, and they told him that they would have to keep it on because it was a precautionary in case you have any real spinal injuries. And when he asked hospital personnel if he could sit up, they told him it's protocol and he would have to stay on the board until they could get the scans on his neck and back to make sure that it was not an issue. He actually, and this is after the arrest, so the relevant timeline for the custody is at the scene in the ambulance and for a brief period in the hospital right before he was put under arrest. So this was after arrest, but it's still relevant to show that the restraints were not police conduct. He asked Detective Bills if he could sit up, and the detective responded, I can't make those decisions for you. I'm not a doctor. So notably, none of the McLean's restraints would have changed had the officer not been there. He also claims that the police suspected him from the beginning, but Detective Bills testified that he was a party of interest and not a suspect. But also that even if they did suspect him, as long as it's not communicated to him, it's not relevant for the custody inquiry. And that's Stansbury v. California. And then finally he makes two, he points to two facts that the law enforcement kept him isolated from family and threatened to handcuff him. And this occurred after he was placed under arrest and read his Miranda rights. So it's not relevant to whether or not he was custody during that brief period, that timeline. Turning now quickly to voluntariness and Mincy, McLean makes two points. He's arguing that it is not materially indistinguishable from Mincy, but he still ignores the key distinctions between Mincy and his case. First, there's no evidence, of course, of police conduct. And the court has made clear that that... But that wasn't entirely the basis for Mincy. It seemed to me that as I read it, they were finding two problems. One is police conduct, but then leaving that aside, that because of his condition, I read that to mean independently that would have been sufficient to demonstrate involuntariness. And at least for purpose of answering my question, how is this case distinguishable apart from the police conduct aspect where they ask questions improperly? So that's separate from whether the person can answer the questions or they're in too much pain or whatever. Putting aside the police conduct, which I still, the state would still maintain is necessary in order to find involuntariness. There is also key differences outside of the police's conduct. The first is the state of McLean versus Mincy. Mincy was brought into the hospital. He was rushed to the emergency room. He had intubation put into his throat to help him breathe. He had tubes to help him eat. And he was immediately in the intensive care unit when officers arrived. And he was only able to respond based on written, because he was not able to talk. And so his state is a lot more, I want to say dire than McLean's. That's not to downplay the pain that McLean was in. And ultimately he had a lacerated spleen. But it's just to say that he was in a much more vulnerable position to begin with. And then also there is no affirmative evidence of his will being overborn. Who has the burden of demonstrating voluntariness? In the state court, yes. But right now we are under AEDPA. And so the court has made the state determination. So McLean here has just not simply shown that the state court's decision finding that it was voluntary is incorrect or is unreasonable. And so notably too, going back to the course of conduct, the state court found that officers had violated Mincy's Fifth Amendment rights. And so the state court only allowed Mincy, or the state, to use his statements as impeachment. They found that Mincy made it clear that he wanted the interrogation to stop until he had a lawyer, but the officers continued to relentlessly question him, only pausing when Mincy fell unconscious or when medical personnel rendered aid. But here McLean says that he told the officers, I'll need my lawyer to tell you that. And there may have been a few other statements. It seems that he was invoking his right to counsel, and I didn't see a response to that in your answering brief. So what statements were made after he invoked counsel, or how do you argue that any of that was permissibly considered? So the state court made a determination that those were limited invocations, and that the officers had honored those limited invocations and stopped questioning him on that specific question. And it also showed that he was lucid, and he was able to say, well, I'm not going to answer that question. But then he reinitiated, and he would ask questions about, well, what happened with the family? What happened with the victim? Is the victim okay? So he would ask substantive questions about the collision, and that continued the interrogation, or the questioning. And it's important also that the officers did not use any threats or promises. And, in fact, at one point, Detective Bills informed McLean that they could not make any deals or promises. And so McLean also talks about the state court applied the wrong standard. But if we look in paragraph 17, the Court of Appeals talks about the totality of the circumstances, and that there must be coercive police conduct. And then they cite to a state court that also cited to Mincy. And so the state court is laying out the correct standard, even if at some point they talk about another factor, that the police did not promise or threaten anything. Can you turn to the argument that your opposing counsel makes that the admission of the prior DUI had essentially no probative value, and it was highly prejudicial, and so that was not a reasonable application of 404 or 404B? That's an uncertified issue, and the respondents are not prepared to discuss the uncertified issue. But if the court does want to certify it, we would be happy to provide supplemental briefing on that issue. Turning to whether or not McLean has satisfied the Breck standard, we would like to take a moment to discuss McLean's reply brief, where he states that it's the state's burden to show harmless nets, but this is incorrect. The Supreme Court has made clear that in both Breck and Brown v. Davenport, that the petitioner is the one that has to establish AEDPA. And Davenport specifically says, to be sure, where Breck is implicated in a federal court, they must also ensure a habeas petitioner has carried his burden under its terms before granting relief. And in fact, a federal court must deny relief to a state habeas petitioner who fails to satisfy either the court's equitable precedence or AEDPA. But to grant relief, of course, a court must find that the petitioner has cleared both tests. And so looking at the records, I think this court should be firmly convinced that even if the statements were involuntary and should have been suppressed, that error did not have a substantial and injurious effect on the verdicts. And McLean makes the argument that the state made that a big portion of its case and that it pushed hard to introduce those statements, but the state's fight was to ensure that the proceedings complied with McLean's constitutional rights. They were the one that brought the issue to the trial court, trying to get a voluntariness ruling. And once the court ruled that it was voluntary, the state requested to redact certain information like the limited invocations or where the detective and McLean had talked about, had a discussion about going to prison. And not only that, but it was a small part of the entire case against McLean. Some of the statements were actually, in fact, cumulative to other evidence that was put forward. And finally, it also actually helped his case because he was able to get in his defense that he had fallen asleep without having to testify. So if we look at the offenses, he was convicted of manslaughter, aggravated assault, and criminal damages, as well as the DUI convictions. And his statements were not necessary for the manslaughter, the aggravated assault, and the criminal damages. We had the blood results. The state had the blood results. The state had the evidence that McLean drove at a high speed into the intersection, that he did not brake or swerve to avoid the line of cars that had stopped at the red light. And then he slammed into the line of vehicles at 60 miles per hour, and the collision caused the death and injuries of the victims. And the blood results, as well, went to the DUI and showed that the statements were not, that they did not have the substantial and injurious effect. Those blood results were that McLean had 16 nanograms per milliliter of THC in his blood, which the expert testified was eight times higher than the two nanograms that could produce impairing effects. And so because McLean cannot satisfy either the EDPA or BREC standards, respondents respectfully request that there are no other questions that this Court affirms the District Court's order. Thank you. Thank you. Mr. Lieberman. Good morning, Your Honors. May it please the Court, Dave Lieberman for the United States. Before I jump into my affirmative points, Judge Beatty, on the two circuit decisions, the 6th and the 11th, those are unpublished decisions. Both circuits have pending litigation on this precise question. The United States has had to intervene in those cases, so, candidly, we don't view those circuits' decisions as having settled those, that issue in the 6th and the 11th. Turning to my affirmative presentation, this Court in Crater held that EDPA's deferential standard of review complied with Article III. Nothing in lope or bright over rules are cast doubt on that decision. And for that reason, Crater forecloses the present constitutional attack. I'd like to start my presentation with the holding of Crater, page 1127 of that decision. This Court said three things about EDPA. EDPA does not dictate the judiciary's interpretation of governing law. EDPA does not mandate a particular result in a pending case. And EDPA does not limit an inferior federal court's interpretive authority to determine the meaning of federal law. EDPA, rather, limits the scope of the habeas remedy to certain circumstances. The holding of Crater remains true today even after lope or bright. Going to Judge Graber's question, lope or bright overruled Chevron, which was a prior Supreme Court decision interpreting judicial review under the Administrative Procedures Act and held that agencies deserve no deference when interpreting a federal statute. That holding does not implicate Crater's discussion of EDPA because, direct quote from Crater 1127, under EDPA we are free if we choose to decide whether a habeas petitioner's conviction and sentence violate any constitutional rights. So that sentence from Crater distinguishes any effort to pull lope or bright into this discussion. And I can drill down on that a little bit in the context of the merits discussion that counsel's been having this morning. When this court is reviewing the Arizona Supreme Court's decisions under Miranda and Mincy, nothing in EDPA requires this court to endorse or adopt as circuit precedent anything that the Arizona court said about Miranda or Mincy. This court is simply asking whether the Arizona Supreme Court's adjudication of those claims meets EDPA's high standard of relief. Was it contrary to or an unreasonable application of federal law? The court's answer to that question, again, does not require the Ninth Circuit to adopt anything that the Arizona courts said or believed about these constitutional rights in play. The other critical point that I want to mention about lope or bright is the Supreme Court, in overruling Chevron, said that agencies have no special competence in resolving statutory disputes, and that was the Supreme Court's justification for revisiting its prior decision in Chevron. The exact opposite is true on federal habeas relief. The Supreme Court has told us this over and over again, that state courts are competent. They are co-equal partners in adjudicating constitutional claims raised in their own proceedings. Shin, the Supreme Court talks about our dual sovereign system. Federal courts must afford unwavering respect, the centrality of the trial in the state system. Miller L., a federal court's collateral review of a state court decision must be consistent with respect due to state courts in our federal system. Going back to Williams v. Taylor, Justice O'Connor's opinion cites a litany of pre-EDPA cases talking about the need for federal courts to give great weight to the considered conclusions of a co-equal state judiciary. So this is another point where lope or bright and Prater diverge, that state courts, unlike federal executive branch agencies, are in fact competent to resolve these claims, and that is firmly entrenched in Supreme Court case law. Another point that opposing counsel has stressed in the reply brief and in the presentation today is this idea that restricting the remedy somehow implicates this court's Article III authority to interpret federal law. Federal criminal law is awash with examples where a court can find a constitutional violation, but the criminal defendant still doesn't have a remedy. So these two points, the violation and the remedy, are not fused together. From my own practice, Rule 52, Federal Rule of Criminal Procedure 52, constitutional claims can be harmless. If there are presentation problems, plain error. In the Fourth Amendment exclusionary rule, the good faith exception under Leon, inevitable discovery, independent source, attenuation under Brown v. Illinois. Turning to the civil side, 1983, plaintiffs can sue state and local officials for violations of constitutional rights, but that statute, as interpreted by courts, provides qualified immunity. No money damages unless the plaintiff proves a violation of clearly established federal law. So that effort to argue that AEDPA's restriction on the remedy somehow impairs this court's authority to decide constitutional violations or interpret the Constitution is incorrect. Final point, counsel has, again, urged this court to adopt Justice Stevens' view of AEDPA and effectively do a de novo review of these constitutional claims in this court, notwithstanding the state court's resolution. Obviously, Justice Stevens' concurring opinion is not controlling authority. I also want to point out that that proposed framework is entirely inconsistent with the historical origins of habeas. We've tried to chart this out in our intervener brief at the time of the founding. State defendants had no right at all to federal habeas review and for much of this country's history, could only come into federal court on jurisdictional complaints. It is only until the middle of the 20th century that federal courts start doing a full-blown review of merits of constitutional claims. And that history is important because the Supreme Court has said that when we are considering separation of powers claims, as Petitioner raises here, history is a guide. That's the Tosky case. And Petitioner's proposed regime would be antithetical to anything that the framers would have seen at the founding or that federal courts would have done throughout much of this country's history. One final point. This claim is being raised all over the country and in district courts all over the circuit. The department is receiving a number of these notices of constitutional questions. Whatever this court decides, the United States would ask that this court would issue a published decision resolving this one way or another so district courts, in conducting their habeas dockets around this circuit, can have resolution of this issue that, again, state petitioners are raising all over. I have two more minutes. I'm happy to rest on my briefs unless the members of the panel have any additional questions. For those reasons, we'd ask that this court reject the constitutional attack on AEDPA. Thank you, Your Honors. Thank you for your argument and thank you for being here today during the government shutdown. All right. I have a couple of things that I want to get to. So I think turning first to the MNC standard, I think one of the things that the state argues is that there were no threats made. But I think, Judge Graber, you, I think, got right to the heart of it, that it's not that. It's that the coercive environment itself is what makes the confession involuntary and that in MNC, I don't believe that there was any evidence of threats made. It was just that the state, by its constant questioning, during an acute medical crisis, was exploiting that situation in such a way that it rendered the confession involuntary. And I view this situation as basically the same as that. The police were following Mr. McClain. They were with him constantly. They were asking him questions on and off. And I think I would point out also that the recording is not continuous. The police would turn off and turn on the recording at various times. So I don't think we know fundamentally whether the questioning was constant, as I think the state has argued that it wasn't. So I would just make that point. So, counsel, we have the recordings and the record. And what I didn't see was anywhere in your brief where you identified the parts of the recording that you're challenging, the admission you challenged that was problematic. Is it just in total, the totality of these recordings, or are there specific statements in there that are prejudicial and harmful? So I think my answer to that would be that it is a totality of the entirety of the recording. The entire recording was played for the jury. It was emphasized multiple times by the state. And what Mincy says, so Mincy differentiates the voluntariness question from Miranda in that it says effectively that even if these statements taken out of the record, even if there was enough evidence absent these statements, that the statements themselves are error and could warrant reversal. In other words, I view Mincy as sort of a more, you look at the entirety of the statements and the coercive effect of everything, and I look at Miranda more as sort of a piecemeal. Did this statement, was it made during a custodial interrogation? And so I think what I would ask this court to do is find that that entire recording emphasized repeatedly by the state, hammered in the state's closing, was prejudicial and that none of it should have been used in the trial court. I want to address a couple of. What particularly was prejudicial about the recordings? So one of the things that the state really emphasized in its closing, so I think they said a couple of things. For one, they said, listen to these recordings. You're getting inside of Mr. McLean's head or something like that. And I think that Mr. McLean's recorded statements that were read, that were played for the jury, you know, as I was saying earlier, that there's this recklessness standard, there's this state of mind that I don't think the state can get to without these statements that Mr. McLean was making. The other thing that I think the state emphasized in its closing was. What statements go to recklessness? What statements in the recording demonstrate recklessness that would be prejudicial to him? So I think one of the things that was happening in the recording was that he was making sort of contradictory statements. And I think the state in its closing was emphasizing the contradictory nature of those statements and saying, look, he's not being truthful. He's saying contradictory things. You can infer from these statements that there was wrongdoing. And so I think sort of those things taken together create the prejudice. And, you know, as this court has said, when the prosecution really significantly relies on statements that can demonstrate prejudice. Okay. Turning to the government's response. So I think one of the things that the government is arguing is effectively that this is a remedial statute, that EDPA is a remedial issue, that it just limits the ability of this court to remedy a constitutional violation. And if you look at the history of how this court in particular, the Ninth Circuit has applied EDPA, prior to Lockyer v. Andrade, the Ninth Circuit had this rule that said effectively you do like a two-step analysis. Step one, was there a constitutional violation? Step two, did the state court violate that constitutional command in an unreasonable way? In Lockyer, the Supreme Court said don't do that. Just analyze the reasonableness of the state court decision. But can't we do that by saying we think that these statute means X and the state court said it means Y. So we think they're wrong, but, you know, it's a pretty close question and they weren't unreasonable. So we'd still be able to state our view of what the law means. I guess I'm having trouble seeing why that isn't still giving us the power to determine what it means. So I think I would come back to Loper-Bright and I would say, you know, in the Loper-Bright decision, the – and Loper-Bright sort of grounds itself in Article III. And I think if that were true, then Loper-Bright might have come out – would have come out differently. And I think also there's an issue where if this court – Well, why can't Congress say, you know, even if a state court was wrong, if it wasn't really, really wrong, don't give them a remedy. So I guess I'm really having difficulty seeing why it isn't a remedial question versus an authority to understand the law question. So I think at base what – and I suppose I agree in theory that a court could still do the two-step analysis that is this constitutional, then is it unreasonably unconstitutional. But in practice, that is not what federal courts are doing under the current AEDPA regime. Under the current practice, federal courts are just looking at the state court decision and saying, is this a reasonable interpretation or not? And that is exactly the analysis that was being done by federal courts of So I think that it would be allowing courts, federal courts and this court, district courts and this court to basically announce constitutional rules and say, but there's nothing we can do about it. And I think that that is probably an impermissible advisory opinion. I see that my time is up. I would ask this court to remand and grant the writ. Thank you. Counsel, thank you all for your arguments this morning. They were very helpful, and this case is submitted.
judges: GRABER, BADE, Navarro